DSS:EMN/SPN/BDM
F.#2014R00191

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N F O R M A T I O N |
| - against - | Cr. No. 15-240 (RJD) (T. 18, U.S.C., §§ 981(a)(1)(C), 1349, and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 26 U.S.C. § 7206(1); T. 28, U.S.C. § 2461(c)) |
| ZORANA DANIS, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION TO ALL COUNTS

At all times relevant to this Information, unless otherwise indicated:

I. Background

1. The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland. FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories. The United

States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following in the 1990s. At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

2. Each of FIFA's member associations also was a member of one of six continental confederations recognized by FIFA: the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC"). Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations. Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3. Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply

2

with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

4. FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations. FIFA helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

5. FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," expressly defined by FIFA's statues to include, among others, all board members, committee members, and administrators of the FIFA confederations. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009,

the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

6. CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, in Luque, Paraguay. CONMEBOL comprised as many as 10 member associations representing organized soccer across South America. CONMEBOL maintained an executive committee whose membership included, variously, a president, one or more vice presidents, a secretary general, a treasurer, and as many as seven directors, all drawn from various of the confederation's constituent national associations. The executive committee was responsible for, among other things, the day-to-day administration of CONMEBOL and the execution of contracts on behalf of the confederation.

7. In connection with its efforts to promote the sport of soccer in South America, CONMEBOL organized and funded a variety of international soccer tournaments to showcase the region's best teams. Among other tournaments, CONMEBOL organized the Copa Libertadores, an annual club tournament featuring the region's top men's club teams. The first edition of the Copa Libertadores was held in 1960 with seven teams. Over the following decades, the tournament

evolved into a major competition featuring 38 teams from approximately 10 countries.

8. As the tournament developed and gained in popularity, CONMEBOL entered into contracts with sports marketing companies to commercialize the marketing rights to the tournament. The marketing rights sold by CONMEBOL in connection with the Copa Libertadores included an array of television rights, sponsorship rights, and, starting in 1997, title sponsorship rights. In 1998, Toyota, Inc. ("Toyota") became the tournament's first title sponsor, a position it held through 2007, during which period the tournament was known as the "Copa Toyota Libertadores." Grupo Santander ("Santander") was the tournament's title sponsor from 2008 to 2012, during which period the tournament was known as the "Copa Santander Libertadores." Bridgestone Corporation ("Bridgestone") was the tournament's title sponsor from 2013 through the present, during which period the tournament was known as the "Copa Bridgestone Libertadores."

9. Television broadcasts of the Copa Libertadores reached millions of viewers in markets across the globe, including the United States. According to CONMEBOL, the Copa Libertadores was among the most widely watched sporting events in the world. The tournament was broadcast in more than 135

countries and, in 2009 and 2010, drew more than one billion viewers. The United States accounted for 16% of the audience share in 2010, behind only Brazil, Mexico, and Argentina.

10. As the popularity and reach of the Copa Libertadores grew, so, too, did the value of the sponsorship rights to the tournament sold by CONMEBOL. The United States was an important and lucrative market for the commercialization of these rights.

II. The Defendant

11. The defendant ZORANA DANIS ("DANIS"), a citizen of Belgium, was the co-founder and owner of International Soccer Marketing, Inc. ("ISM"), a company the defendant created with her father in or about 1989 for the purpose of acquiring and selling sponsorship rights to soccer events. ISM was incorporated in Delaware and headquartered in Jersey City, New Jersey.

12. Starting in 1996 and continuing thereafter, DANIS/ISM was the exclusive marketing agent for the sponsorship rights to the Copa Libertadores. As marketing agent, DANIS identified potential tournament sponsors and negotiated contracts for the commercialization of the sponsorship rights to the tournament, including with major international businesses based or with offices in the United

States, all in exchange for commission payments. In her role as agent, DANIS also was responsible for the implementation of promotional programs related to the Copa Libertadores, including the production and display of stadium advertisements during tournament matches.

13. DANIS secured her role as exclusive marketing agent for the Copa Libertadores tournament through a series of contractual relationships with CONMEBOL and, at times, a British Virgin Islands corporation and its subsidiary, both headquartered in Bermuda and run by a friend and business partner of DANIS's husband (together and individually, the "ISM affiliate").

III. The Defendant's Co-Conspirators

14. The identities of the following individuals are known to the United States Attorney:

15. At various times relevant to this Information, Co-Conspirator #1 was a high-ranking official of FIFA and CONMEBOL.

16. At various times relevant to this Information, Co-Conspirator #2 was a high-ranking official of CONMEBOL and a FIFA official.

17. As officials of CONMEBOL and FIFA, Co-Conspirator #1 and Co-Conspirator #2 were bound by fiduciary duties to both entities.

IV. The Fraudulent Scheme

18. DANIS, together with others, including Co-Conspirator #1 and Co-Conspirator #2, agreed to engage in a scheme involving the offer, acceptance, payment, and receipt of undisclosed bribes and kickbacks in connection with contracts obtained by DANIS, ISM, and the ISM affiliate for the worldwide title and non-title sponsorship rights associated with the Copa Libertadores.

19. In or about 1996, CONMEBOL designated DANIS/ISM as its marketing agent for sponsorship rights associated with the Copa Libertadores. In her role as marketing agent, DANIS received commissions from CONMEBOL and, eventually, from the ISM affiliate, based on a percentage of the value of the contracts DANIS negotiated with tournament sponsors.

A. Title Sponsorship Rights

20. In or about 1997, pursuant to her role as exclusive marketing agent for the Copa Libertadores, DANIS developed and presented to Co-Conspirator #1 the concept of selling title sponsorship rights to the tournament, which concept Co-Conspirator #1 approved. Thereafter, DANIS was

CONMEBOL's exclusive marketing agent for the title sponsorship rights to Copa Libertadores, a position she secured and retained through a series of contracts between CONMEBOL and ISM. As marketing agent, DANIS negotiated title sponsorship contracts and contract renewals with Toyota, Santander, and Bridgestone for their respective periods of title sponsorship in exchange for commission payments. DANIS was a signatory to each contract and contract renewal between CONMEBOL and the various title sponsors of the tournament.

21. On or about August 15, 1997, CONMEBOL, ISM, and a Japanese marketing agency (the "Japanese Marketing Agency") acting on behalf of Toyota entered into a contract pursuant to which Toyota became the first title sponsor of the Copa Libertadores. Toyota agreed to pay CONMEBOL $2.8 million, $2.9 million, and $3 million, respectively, for the title sponsorship rights to the 1998, 1999, and 2000 editions of the tournament. The signatories to the contract were DANIS, on behalf of ISM and as CONMEBOL's exclusive marketing agent; Co-Conspirator #1 and Co-Conspirator #2 on behalf of CONMEBOL; and a representative of the Japanese Marketing Agency, for the benefit of Toyota. Toyota subsequently contracted with the same parties to pay $3.75 million per edition for the title sponsorship rights to the 2001 through 2005 editions of the

9

tournament, and $3.9 million per edition for the title sponsorship rights to the 2006 and 2007 editions of the tournament. In total, Toyota paid CONMEBOL $35.25 million for the title sponsorship rights to the Copa Libertadores from 1998 through 2007.

22. On or about September 27, 2007, CONMEBOL, the ISM affiliate, and Santander entered into a $40 million contract pursuant to which Santander became the title sponsor of the Copa Libertadores for the 2008 through 2012 editions, at a cost of $8 million per edition. The signatories to the contract were DANIS, on behalf of ISM and as CONMEBOL's exclusive marketing agent; Co-Conspirator #1 and Co-Conspirator #2, among other members of the CONMEBOL executive committee, on behalf of CONMEBOL; and representatives of Santander and a Chilean company acting as an intermediary rights holder on Santander's behalf.

23. On or about October 19, 2012, CONMEBOL, ISM, and Bridgestone entered into a $57 million contract pursuant to which Bridgestone became the title sponsor of the Copa Libertadores for the 2013 through 2017 editions, at a cost of $11 million per edition for the 2013, 2014, and 2015 tournaments, and $12 million per edition for the 2016 and 2017 tournaments. The signatories to the contract were DANIS, on

behalf of ISM and as CONMEBOL's exclusive marketing agent; Co-conspirator #1 on behalf of CONMEBOL; and representatives of Bridgestone and an intermediary rights holder on Bridgestone's behalf.

B. Non-Title Sponsorship Rights

24. In or about 2000, DANIS arranged for the ISM affiliate to obtain the sponsorship rights, excluding title sponsorship rights, to the tournament from CONMEBOL. Specifically, on or about March 17, 2000, CONMEBOL, DANIS, and the ISM affiliate entered into a $56.1 million contract pursuant to which, among other things: (a) the ISM affiliate acquired the sponsorship rights to the Copa Libertadores, exclusive of title sponsorship rights, for each edition of the tournament from 2001 through 2007; (b) CONMEBOL designated, and the SBI affiliate agreed to the designation of, DANIS as exclusive marketing agent for the sponsorship rights to the tournament; and (c) the parties agreed that DANIS would be compensated in her role as agent through a separate contract with the ISM affiliate. The signatories to the contract were DANIS, the ISM affiliate's managing director, and, on behalf of CONMEBOL, Co-Conspirator #1 and Co-Conspirator #2. The contract was renewed in or about 2007 and again in or about 2012.

25. From 2001 through the present, DANIS received compensation from the ISM affiliate for her work as exclusive marketing agent for the non-title sponsorship rights to the Copa Libertadores through a series of contracts between ISM and the ISM affiliate. DANIS's annual compensation comprised, in various combinations, commission payments and operator and retainer fees.

C.   The Payments

26. Beginning in or about the early 2000s, Co-Conspirator #1 and Co-Conspirator #2 at various times solicited and demanded bribe and kickback payments from DANIS in exchange for their support, as high-ranking CONMEBOL officials and members of its executive committee, of DANIS as the exclusive marketing agent for the sponsorship rights to the Copa Libertadores. Co-Conspirator #1 and Co-Conspirator #2 specified various means for DANIS to make the payments, including direct payments into corporate or personal bank accounts controlled by the bribe recipients.

27. DANIS agreed to make and did make the payments. Among other things, the purpose of the payments was to obtain and/or retain, for herself and for the ISM affiliate, contracts for the sponsorship rights associated with the Copa Libertadores, the ability to commercialize those rights, and

12

the potential to secure contracts for sponsorship rights to additional CONMEBOL tournaments.

D. The Use of the Wire Facilities of the United States

28. Beginning in or about the early 2000s, DANIS and her co-conspirators, including Co-Conspirator #1 and Co-Conspirator #2, directly or through their personal assistants, frequently used the wire facilities of the United States to communicate by email in furtherance of their criminal scheme.

29. As early as 1997, DANIS maintained bank accounts in the United States. DANIS and her co-conspirators, including Co-Conspirator #1 and Co-Conspirator #2, used the wire facilities of the United States to transfer contractual and illicit payments to Co-Conspirator #1 and Co-Conspirator #2 in connection with DANIS/ISM's and the ISM affiliate's acquisition and exploitation of marketing rights associated with the Copa Libertadores. DANIS was based in the United States and conducted much of her business, including the wire activity described below, from the United States.

30. For example, in or about and between February and May 2006, DANIS agreed to make, and did make, a bribe payment to a personal bank account of Co-Conspirator #1 in Paraguay. DANIS used the wire facilities of the United States to communicate over email and by telephone in New Jersey to

13

coordinate the transfer of funds from the ISM affiliate's account to Co-Conspirator #1's account.

31. From time to time in or about 2008, Co-Conspirator #1 directed DANIS to make payments above and beyond any payments that she owed by contract to a CONMEBOL bank account in Paraguay. DANIS used the wire facilities of the United States to make the payments and to communicate with bank officials and others to facilitate the payments.

32. Also in or about 2008, after ISM, CONMEBOL, and Santander entered into the $40 million title sponsorship contract described above, Co-Conspirator #2 solicited bribe and kickback payments from DANIS in the amount of $400,000 per year. DANIS agreed to make these payments and used the wire facilities of the United States to make bribe and kickback payments to Co-Conspirator #2 periodically until 2012, through two companies controlled by Co-Conspirator #2, Company A and Company B, the identities of which are known to the United States Attorney.

33. The following are examples of DANIS's use of the wire facilities of the United States in furtherance of the fraudulent scheme described herein:

| DATE | WIRE COMMUNICATION |
|---|---|
| October 21, 2008 | Wire transfer of $250,000 from an ISM account at Citibank N.A. in New York, New York to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| November 10, 2008 | Wire transfer of $250,000 from an ISM account at Citibank N.A. in New York, New York to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| December 15, 2008 | Wire transfer of $250,000 from an ISM account at Citibank N.A. in New York, New York to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| February 10, 2009 | Wire transfer of $200,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |
| March 2, 2009 | Wire transfer of $200,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |
| February 9, 2010 | Wire transfer of $100,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |

| | |
|---|---|
| February 16, 2010 | Wire transfer of $100,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |
| February 26, 2010 | Wire transfer of $100,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |
| March 10, 2010 | Wire transfer of $100,000 from an ISM account at Citibank N.A. in New York, New York to a Merrill Lynch account in the name of Company A in Montevideo, Uruguay. |
| February 11, 2011 | Wire transfer of $261,000 from an ISM account at Citibank N.A. in New York, New York to an account in the name of Company B at Pershing, LLC, a subsidiary of Bank of New York, Mellon, based in Jersey City, New Jersey. |
| March 1, 2011 | Wire transfer of $250,000 from an ISM account at Citibank N.A. in New York, New York to an account in the name of Company B at Pershing, LLC, a subsidiary of Bank of New York, Mellon, based in Jersey City, New Jersey. |

* * * *

34. No disclosure of the foregoing bribery and kickback scheme was made to FIFA or CONMEBOL, including without limitation to their respective executive committees, congresses, or constituent organizations.

## COUNT ONE
(Wire Fraud Conspiracy)

35. The allegations contained in paragraphs 1 through 34 are realleged and incorporated as if fully set forth in this paragraph.

36. In or about and between 2000 and 2012, both dates being approximate and inclusive, within the Southern District of New York, the defendant ZORANA DANIS did knowingly and intentionally conspire to devise a scheme and artifice to defraud CONMEBOL, FIFA, and their constituent organizations of their right to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Fraud and False Statements in Tax Returns)

37. The allegations contained in paragraphs 1 through 34 are realleged and incorporated as if fully set forth in this paragraph.

38. On or about April 15, 2010, within the District of New Jersey, the defendant ZORANA DANIS, a resident of New Jersey, did willfully make and subscribe a United States Corporate Income Tax Return, Form 1120, for International Soccer Marketing, Inc., for the fiscal tax year beginning August 1, 2008, which was verified by a written declaration that it was made under penalties of perjury and which was filed with the Internal Revenue Service, which tax return the defendant ZORANA DANIS well knew was not true and correct as to every material matter, in that said return claimed that ISM paid an "activation rights fee" of $1.25 million that constituted a deductible business expense, whereas ZORANA DANIS then and there well knew that the figure was a false and overstated amount that included bribe and kickback payments.

(Title 26, United States Code, Section 7206(1); Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

39. The United States hereby gives notice to the defendant that, upon her conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offense.

40. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

_____
KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK